GABEL-LOCKHART COMPANY, a Corporation, and HORACE C. LOCKHART, Appellants, v. HENRY J. GABEL, Respondent, No. 41467—229 S. W. (2d) 539.

Division One, April 10, 1950.

Judgment Modified and Motion for Rehearing Overruled in Per Curiam Opinion, May 8, 1950.

*Thomas L. Brown* and *Richard K. Phelps* for appellant; *Gage, Hillix & Phelps* of counsel.

520

*Landry Harwood* for respondent; *Meredith & Harwood* of counsel.

VAN OSDOL, C.—Action to recover $14,295.07, the total amount of two checks issued and paid by plaintiff Gabel-Lockhart Company, a corporation, to defendant Henry J. Gabel, payee. Upon motion of defendant Gabel, Horace C. Lockhart was made a third-party defendant. The trial court rendered judgment against plaintiff and for defendant Gabel on plaintiff's claim; and against Horace C. Lockhart, third-party defendant, and for Gabel on his claim as third-party plaintiff. Gabel-Lockhart Company, plaintiff, and Horace C. Lockhart, third-party defendant, have appealed.

The plaintiff's alleged claim arose out of a written "Agreement" of July 5, 1946, by which Horace C. Lockhart, appellant, undertook to purchase from Henry J. Gabel, respondent, 160 of the 300 shares of corporate stock of plaintiff-appellant corporation. The checks were given as part payment of the stipulated purchase price. It is the theory of plaintiff's claim that the checks, although their issuance was authorized, were issued by mistake, in that the checks were inadvertently for sums greatly in excess of amounts due defendant Gabel under the terms of the Agreement.

The material provisions of the Agreement are as follows,

"1. The Buyer (appellant Horace C. Lockhart) shall pay the Seller (respondent Henry J. Gabel) in cash the sum of $16,000.00 for said 160 shares * * *.

"3. *The Buyer further agrees as a part of the purchase price* of said 160 shares of stock now owned by the Seller, *to pay the Seller 20% of the net profits of the Company* semi-annually for a period of five years, beginning July 1, 1946, and ending with the six months' period which terminates on June 30, 1951 * * *. (Our italics.)

"4. As soon as the semi-annual profits have been computed and ascertained, the 20% proportionate share due the Seller shall be paid him in cash, but in any event said semi-annual payments shall be made on or before the 15th day of January and July of each year. * * *

"5. The Seller, in June, 1946, was paid by the Company $3,600.00 and this amount shall be charged against his proportionate share of the profits for the first six months of 1946.

"As soon as practicable the Books of the Company shall be balanced and a financial statement prepared reflecting the net profits of the Company for the first six months' period of 1946 as at the close of business June 30, 1946, and thereupon there shall be paid to the Seller in cash his share of said profits based on 150 shares of stock, the Seller having heretofore contracted to pay E. C. Carver the dividends on ten shares of stock of the Company during the term of his employment by the Company. * * *

"7. The profits of the Company and share in which the Seller shall be entitled to receive as herein set forth shall be computed on brokerage actually received by the Company up to and including June 30, 1946, and shall not include brokerage on futures or any brokerage received after said date by the Company. * * *

"9. The salary of the Buyer for the duration of this contract shall be $6,000.00 per annum, payable monthly, and in addition thereto 10% of the annual profits of the business.

"10. It is agreed between the parties hereto that the Buyer during the term of this contract shall not engage in any business, or organize any new company or association, which shall directly or indirectly compete with the business conducted by the Company. * * *""

The sum of $16,000 (Paragraph 1 of the Agreement, supra) was paid in cash by appellant Lockhart to respondent Gabel as stipulated; and on January 7, 1947, the appellant corporation issued its check for $7,769.18 payable to respondent Gabel, and enclosed the check in the corporation's letter, signed by appellant Lockhart, stating, "You will find attached statement of business for the last six months of 1946 also our check in the amount of $7769.18 which represents 20% of the net profits as per our agreement." (Paragraph 3 of the Agreement, supra.) And on July 7, 1947, the appellant corporation issued its check for $6,525.89 and enclosed the check in the corporation's letter of that date, signed by appellant Lockhart, in which letter it was stated, "You will find attached a check in the amount of $6,525.89 which represents 20% of our net profit of our operations for the first six months of 1947. We are also attaching statement earnings and disbursements covering this period, and we consider ourselves quite fortunate that we were able to do as well as we did during this period."

Plaintiff-appellant and its predecessor corporations have been successfully engaged in the food-brokerage business in Kansas City for years. Defendant-respondent, Gabel, was one of the incorporators of the original predecessor corporation in 1904. Food brokerage is said to be a "highly personalized" business. It is inferred the brokerage corporation's receipts (or income) were derived from commissions paid by its principals, food producers. The shareholders and officers of the corporation have been active in the business; and the income of the corporation, after deductions for stated salaries and other current operating expenses, has been, since 1939, divided among the shareholders, save for a remaining small balance of the income. Appellants urge this comparatively small balance is "net profits" within the meaning of such term as used in Paragraph 3 of the Agreement. Such small balance for each of the years 1946 and 1947 was $900. But the receipts of the corporation ■■■ (after deducting stated salaries and other current operating expenses) which were subject to division among shareholders for the last six-month period of 1946 were in the amount of $43,162.10 and for the first six-month period of 1947 in the amount of $36,254.97, totaling $79,417.07 for the two stated six-month periods. Now it is the contention of appellants the two checks dated January 7 and July 7, 1947, totaling $14,295.07, were mistakenly computed. Say appellants, the total of the two checks should have been $180, that is, 20% of $900.

In the years 1942 to 1945, inclusive, defendant-respondent Gabel was not active and produced a small part of the corporation's gross income. In 1942, he produced but $896; in 1943, $992; in 1944, $1,522; and in 1945, $580. Defendant Gabel did not "go to·the office" in 1946. However, the gross income produced by the active personnel (exclusive of that produced by the inactive Gabel) for the years. 1942 to 1946, inclusive, was respectively $81,531, $79,695, $99,887, $123,000, and $185,832.

As indicated supra, plaintiff-appellant does not seek to recover the amount of the two checks on the theory the issuance of the corporation's checks in payment of Lockhart's contractual obligations was unauthorized. See Section 3225 R. S. 1939, Mo. R. S. A. § 3225. Plaintiff-appellant asserts the checks (although their issuance in payment of Lockhart's contractual obligations was authorized) were inadvertently issued for the wrong amounts, representing gross overpayments to defendant-respondent, who, if permitted to retain such overpayments, would be unjustly enriched. Plaintiff-appellant insists that the uncontradicted evidence shows the mistake; and that the trial court's finding for defendant-respondent is against the evidence, the weight thereof, and for the wrong party.

Appellant, Horace C. Lockhart, president of the corporation, testified he had signed the checks and letters of January 7 and July 7,

1947, and had done so without particularly examining them. The checks and letters (and enclosed statements) were prepared by the treasurer, R. E. Israel, who, not knowing of the contract of purchase, had mistakenly made out the checks on the "old system" of distribution. According to the testimony of appellant Lockhart, the distribution of receipts of the corporation to the shareholders on the old system was "additional compensation," that is, compensation additional to stated salaries which (with other current operating expenses) were already deducted from gross receipts. The distribution was made according "to the holdings of the stock of the various individuals on the records of our company." Such a distribution was pursuant to a verbal agreement existent since 1939. The witness testified such distribution proportional to "stockholdings" was made *providing* the stockholders were "active in the company and producing business"; however, the witness stated respondent Gabel received distribution proportionate to his stockholdings during the years he was inactive—during such years, Gabel "got exactly what his stock entitled him to."

The shareholder and treasurer, R. E. Israel, testified he had figured distributions for the last six months of 1946 and the first six months of 1947, and made out the two checks to Gabel on the "old system" carried on when Gabel was present and active in the firm, "based at that time on 20 per cent of net profits."

O. H. Hicks, secretary of the corporation, testified that, in November 1947, he discovered the entries on the books of the corporation disclosing the issuance of the two checks to Gabel. He stated the board had then been convened and a resolution adopted directing counsel to proceed to recover the money. (The resolution, in so far as it recited the checks in issue had been mistakenly issued, was self-serving.)

Other evidence will be referred to in the course of this opinion.

The instant case is one tried upon the facts without the services of a jury. We will review the case upon both the law and the evidence as in cases of an equitable nature, and the judgment will not be set aside unless clearly erroneous. Section 114, Civil Code of Missouri, Laws of ▮▮▮ Missouri, 1943, pp. 387-388, Mo. R. S. A. § 847.114.

Language of the contract of purchase, and elements of fact disclosed by the testimony of plaintiff's own witnesses, clearly support the trial court's finding and judgment against plaintiff on its claim. The whole record convincingly supports the inferences the two checks were not inadvertently issued in greater amounts than the contract provided, but were issued in no greater amounts than the parties to the contract intended and as the contract was initially interpreted by the parties. Assuming, as appellants contend, the distribution of receipts (after deduction of stated salaries and other

current operating expenses) among the stockholders was "additional compensation" and was not in any sense a declared dividend, nevertheless we believe such amount available for such a distribution was intended by the parties to be included in "net profits" as the term is used in the Agreement.

In the case of Crocker v. Barteau, 212 Mo. 359, 110 S. W. 1062, at page 1067, this court noted the various conclusions reached by the courts as to the meaning of the term "net profits" in the peculiar circumstances of each case. See also Vol. 28, Words and Phrases, Net Profits, pp. 539-546. In the Crocker case one Scott was to be paid part of the purchase price for interests in a partnership mining property, such part of the purchase price having been contracted to be paid out of the "first net profits" of the mine. The term "first net profits" was construed as the first profits arising from the sale of ores over and above the current expenses in operating the mine, including current repairs and betterments, and not including outlays of capital. This court, in its opinion, quoted the language of the Supreme Court of the United States in Eyster v. Centennial Board of Finance, 94 U. S. 500. In the Eyster case a corporation's business was that of a Centennial Exhibition, the profits of which business were derived only from receipts. The receipts over and above current expenses were the profits of the business. Such net receipts, according to common understanding, ordinarily represent the profits of a business. "Popularly speaking, the net receipts of a business are its profits." And in a case where profits are derived only from receipts, to the popular mind the net receipts would represent the "net profits." In our case, it will be readily seen the use of the term "net profits" was general, not only in the contract but also in the letters accompanying the two checks. See Paragraphs 3, 5 and 9 of the Agreement, supra; "20% of the net profits," letter of January 7, 1947, supra; and "20% of our net profit of our operations," letter of July 7, 1947, supra. And see also quoted language of the witness Israel in referring to the "old system" whereby distribution was made of a percentage of the "net profits." It would seem the general use of the term "net profits" was in an ordinary sense, that is, "net profits" were receipts, after deductions for stated salaries and other current operating expenses, and, specifically in our case, before distributions proportionate to shareholdings.

The meaning of the term "net profits" should be accepted and the contract construed according to the contracting parties' intention. It has been said that, in construing a contract of doubtful meaning, the court must give such a construction as will be fair and reasonable. In reaching a construction "that is fair and reasonable under all the facts and circumstances, the court may consider the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances at-

526

tending the execution of the contract and its interpretation by the parties." Paisley v. Lucas, 346 Mo. 827, 143 S. W. 2d 262, and cases therein cited; Industrial Bank & Trust Co. v. Hesselberg, Mo. Sup., 195 S. W. 2d 470. While there was testimony the value of the corporate stock was $100 per share and by the contract of purchase appellant Lockhart undertook to pay and paid $100 per share for respondent's 160 shares, yet it is clear the stock was of far greater value. The income of the corporation, after deductions of stated salaries and current expenses, for the last six months of 1946 was over $43,000; and the income, after deductions for stated salaries and current expenses, for the first six months of 1947 was over $36,000. It does not seem reasonable the parties contemplated the term "net profits" should mean only that which might be left ($900) after the proportionate distribution of the foregoing amounts to the shareholders. It is readily seen that, had respondent Gabel retained his stock, his distributive share proportional to 150 of the 300 shares of stock would have been in excess of $39,000 for the twelve-month period, July 1, 1946, to July 1, 1947. (While Gabel had owned 160 shares, apparently he was entitled to proportional distribution upon 150 shares. See Paragraph 5, Agreement, supra.)

Having examined Paragraph 5 of the Agreement, we have noted the use of the term "net profits" of the corporation in connection with the *first* six-month period of 1946. Such net profits were to be based on 150 shares of stock, and the sum of $3,600 paid respondent in June was to be charged against respondent's proportionate share of the profits for the first six months of that year. It seems obvious the term "net profits" as used in Paragraph 5 was of an intended meaning which contemplated an amount of distribution to Gabel in excess of $3,600, and not a comparatively small balance of receipts (such as half of $900) which might have been retained for dividends after such proportionate distribution of "net profits" to shareholders. (We consider the fact, if so, the Collector of U. S. Internal Revenue approved the "comparatively small" sum of $900 as net income of the corporation taxable for particular years is not decisively persuasive in our case.)

We further consider the interpretation placed upon the contract by appellant Lockhart by his conduct in signing the checks and the letters in which the checks were enclosed, notwithstanding his testimony of his reliance upon Israel's computations. It may be inferred appellant Lockhart made the arrangement whereby the corporation was to pay his obligation under the Agreement. Statements of the corporation's business for the respective six-month periods accompanied the letters, in which statements the amount of the two checks in issue are shown as 20% of the "net profits" as computed, after stated salaries (including the $6,000 and 10% of the net profits

as per Paragraph 9 of the Agreement) and other current expenses were deducted.

We are of the opinion the trial court's finding for respondent on plaintiff-appellant's claim was not erroneous. The parties to the contract of purchase in their use of the term "net profits" must have intended the profits of the corporation after stated salaries and other current operating expenses were deducted. Such a construction is a reasonable one in the shown circumstances, and the contract was so initially construed by the parties thereto.

The trial court's judgment, upon the claim of respondent Gabel as third-party plaintiff against appellant Lockhart as third-party defendant, was for amounts $863.24 and $725.11, respectively found to be additionally due Gabel for the last six-month period of 1946 and the first six-month period of 1947; and for $4,128.18, being 20% of the net profits for the last six-month period of 1947. The first two stated amounts were found to be due Gabel on the theory the 10% of the annual net profits additional to $6,000 salary, stipulated in Paragraph 9, should not have been deducted before computing the 20% of net profits due Gabel.

The appellant Lockhart contends the petition of the third-party plaintiff does not state facts to justify the relief granted, and has made the further contentions we have examined and disposed of, supra, in the review of the judgment for defendant upon plaintiff's claim.

The third-party petition alleged the contract of purchase and the third-party plaintiff's receipt of the two payments of $7,769.18 and $6,525.89, and disclaimed knowledge such payments included all of the amounts then due. The petition stated that, if plaintiff corporation should obtain a judgment against Gabel as defendant, he, third-party claimant, had a claim against Lockhart, third-party defendant, for the amount of such judgment. And by amendment the third-party petition further sought the relief of a judgment against appellant Lockhart, third-party defendant, not only for such sum or sums which he, Gabel, might be compelled to pay upon judgment for plaintiff corporation, but also for sums of $863.24 and $725.11 alleged to be additionally due, respectively, for the last six-month period of 1946 and the first six-month period of 1947; and for the further sum of $4,128.18, 20% of the net profits for the last six-month period of 1947.

Appellant Lockhart's challenge to the sufficiency of the third-party petition is upon the ground the procedure of the cross-claim against him is not allowable under the Civil Code of Missouri. He reminds us the plaintiff did not amend its petition to state a claim against him, the third-party defendant. The case of State ex rel. McClure v. Dinwiddie, 358 Mo. 15, 213 S. W. 2d 127, is cited. The cited case does not support appellant Lockhart's contention in

the instant case wherein the original defendant Gabel has stated a cross-claim against the third-party defendant, appellant Lockhart. In the instant case the third-party defendant, appellant Lockhart, was liable to defendant-respondent Gabel on the contract of purchase for the stipulated purchase price. Defendant-respondent Gabel was entitled to recover from appellant Lockhart such additional amounts stipulated in the contract as were not included in the amounts of the two checks in issue. The claims of plaintiff and defendant arose out of the same transaction. The procedure, whereby appellant Lockhart was made a third-party defendant, was proper in making disposition in one litigation of the issues of plaintiff's claim against defendant and defendant's claim as a cross-claimant against appellant Lockhart. See Sections 20, 77 and 78, Civil Code of Missouri, Laws of Missouri, 1943, p. 353 at pages 362, 363 and 377, Mo. R. S. A. §§ 847.20, 847.77, 847.78. The McClure case was a tort action in which it was held that, in such a case, defendant could not compel plaintiff to accept defendant's joint tort feasor as a third-party defendant.

The judgment should be affirmed.

It is so ordered. *Lozier* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.

### ON MOTION FOR REHEARING.

PER CURIAM:—Appellants in their motion for rehearing urge the trial court was in error in finding for respondent Gabel as third-party plaintiff for the amounts of $863.24 and $725.11, respectively found to be additionally due Gabel for the last six-month period of 1946 and the first six-month period of 1947; and for $4,128.18, being 20% of the net profits for the last six-month period of 1947. Examining the record we have noted the testimony of the treasurer Israel that 20% of the net profits for the last six-month period of 1947 equaled $4,128.18, and we can see no error in the trial court's rendition of judgment against appellant Lockhart for that sum for that period.

As stated in the principal opinion the first two stated amounts, $863.24 and $725.11, were found to be due Gabel on the theory the 10% of the annual net profits additional to $6,000 salary to appellant Lockhart, as stipulated in Paragraph 9 of the Agreement, should not have been deducted before computing the 20% of net profits due Gabel. We have re-examined the Agreement. We have reconsidered the shown facts that respondent Gabel has received, cashed and retained the proceeds of the checks for the amounts of $7,769.18 and $6,525.89, which amounts were shown by statements rendered respondent Gabel to have been computed *after* the deduc-

tion of 10% of the net profits. It was apparently intended the "$6,000 per annum, payable monthly, and in addition thereto 10% of the annual profits" were to be included in stated salaries and other operating expenses and deducted before computing the 20% of the net profits due respondent Gabel. The intended effect of the Paragraph 9, in our view, was to put a limitation upon the ▮▮▮ amount of appellant Lockhart's compensation which could be included in stated salaries and other operating expenses during the term of the Agreement. We can see no other purpose for the provisions of Paragraph 9 of the Agreement.

Therefore, we agree with movant that the trial court's judgment for respondent Gabel for the sums of $863.24 and $725.11 should be reversed, and that the judgment should be modified to declare that the 10% stipulated in Paragraph 9 was and is to be correctly deducted before the computation of the 20% of the net profits due Gabel in making the semi-annual payments for the five-year period of the Agreement. Otherwise, the judgment should be affirmed. Our principal opinion is accordingly modified.

The motion for a rehearing is overruled.